WRIGHT *vs.* THE NEW YORK CENTRAL RAIL ROAD CO.

The section of the code which limits the right of examining a plaintiff as a witness, to cases in which the adverse party or person in interest is living, should be so ·construed as to admit a person who has an action with a *corporation*, to be a witness in his own behalf.

Although it is settled law that a principal is not liable to a servant for injuries sustained by reason of the negligence of another servant, when both are engaged in the same general business, in the service of the principal, yet it is the duty of the master, to all his servants, to use reasonable care in providing them with careful and competent fellow servants; and he is liable for injuries to any servant arising from his neglect to use such care; in the absence of proof that the injured servant was aware of the incompetency of his fellow servant.

The power to employ servants may be delegated by the principal; especially when the principal is a corporation. When the principal thus acts by an agent he will, upon general principles, be liable for the negligence of the agent. Such agent will not be regarded simply as a fellow servant of those whom he employs in the general business.

In an action against a rail road company, brought by a brakeman in its employ, to recover damages for an injury sustained by means of a collision, it is not erroneous for the judge to charge the jury that it was the duty of the defendant to use reasonable care, in order to employ an engineer of competent skill and experience; and that if they find that ordinary care was not used, in providing the engineer on the occasion of the collision, and the injury to the plaintiff was occasioned by such negligence, the defendant is liable for the consequences.

It is negligence in a rail road company so to arrange its time-tables as to permit trains approaching a station from opposite directions, on the same track, to reach the station at the same moment.

And this, although one of the trains is directed to run off upon a side track, at the station; if experience shows that there is danger, especially in a dark night, of a train running past the switch at the station, and thus coming in collision with the other train.

MOTION by the defendant, for a new trial, upon a case and exceptions. The plaintiff was in the employ of the defendant as a brakeman, and on the night of the 6th of June, 1856, was injured by a collision of the trains, at Pekin, eight and a half miles east of Suspension Bridge, on the road to Rochester. It was conceded by the plaintiff, on the trial, that a servant, sustaining injury by reason of the carelessness and negligence of a fellow servant in the same employment

could not recover. It was claimed by the plaintiff that the injury in this case was occasioned by the negligence of the defendant, in employing an incompetent engineer, upon the train going east from the bridge. Also in arranging the time table so that the trains should meet at the same time at Pekin. Wm. H. Adams was the engineer alleged to have been incompetent. He was employed by Mr. Upton, the managing agent of engineers and the person authorized by the defendant to employ engineers. Mr. Adams was a witness for the plaintiff. He had been an engineer some four years, and had been in the employ of the defendant 19 months, during which time he had run trains over the road from Suspension Bridge to Rochester about 12 times, and had ridden on the cars at other times. He had, as engineer, run two trips with passenger cars, before the collision. He had, for most of the 19 months, been employed in running trains from Buffalo to Lewiston. The evening before the collision, Adams was in Rochester, and Upton told him, as he says, that on account of the sickness of the engineer of the " J. A. Willink," he would have to come down with the express train the next night. He says he told Upton that he did not feel competent to take the train over the road in the night; in the day time he could take any train over the road. Upton says he heard nothing from Adams about his want of acquaintance with the road. Mr. Jackson was present at the conversation between Upton and Adams, and he does not speak of Adams' saying any thing about not feeling competent to take the train over at night. Adams went to the bridge, that night, with a freight train. Adams states that he should want three weeks knowledge of the road, by running every day, to get acquainted with it; that it is essential to know the objects, so as to know when you are approaching stations; that he had not run on that road often enough to know it. The time for leaving the bridge was 9 o'clock and 20 minutes. It actually left at 9,30. Pekin, eight and a half miles from the bridge, was the first station, and the train was

due there at 9,40. The night was dark and foggy. Adams says that on reaching Pekin he saw a train; that it appeared to him to be on the switch coming west; that he thought it was stationary; that he had got about half way of opposite the station—about the middle of the side track—before he discovered that the other train was not on the side track. That there were two switches—one at the east end of the station, and the other at the west. That he had shut off steam, reversed the engine and put down the brakes, but not in time to avoid the collision. Anthony Powell was the engineer on the up train. He testified that as he approached Pekin he saw the head light of the down train, and supposed the train stationary. That he put his head out of the window, and from the noise the other train was coming very fast. When he first saw the light, it may have been 40 rods distant. He says he was a little ahead of time. His instructions were to go on time, and get on to the switch and wait until the down train came. Both engines were furnished with time tables, in which both trains were due at Pekin at 9,40. The up train was to go on to the switch. Carpenter was the conductor of the down train, and he and Adams had a conversation, before starting from the bridge, in which Carpenter told Adams that in case the up train had not arrived at Pekin he was to stop five minutes. Carpenter says that in this conversation Adams remarked "We meet the express at Pekin, and if not there we wait five minutes for variation of watches." And he told Adams he had better stop there, any way, to make a sure thing of it. He says the time, 9,40, was just up when Adams gave the signal to brake. The collision occurred before the up train had run on to the switch. The plaintiff was sworn and examined as a witness, under objection and exception.

A part of the injury to the plaintiff was a broken leg, and some seven or eight weeks after the injury he had so far recovered that he could walk about, when, by slipping down upon the sidewalk, the leg was again broken. The leg was badly

twisted before the second breaking. The defendant objected to any evidence to show the state of the leg, after the second breaking. The objection was overruled, and the defendant excepted. The defendant gave evidence tending to show that Adams was a competent and skillful engineer. Also evidence tending to show that an engineer who has run over a road two or three times is competent, with a time table, to take charge of a train. Some of the witnesses say, three or four times, and that by running a freight train the engineer has more time for observation, to enable him to become acquainted with the road.

When the plaintiff rested, the defendant moved for a nonsuit, on the grounds, 1. That the evidence was not sufficient to justify submitting to the jury the question whether the injury to the plaintiff had been caused by the negligence of the defendant. 2. If the evidence tended to show negligence in Upton, the defendant was not chargeable with any of the consequences of such negligence. 3. That the evidence did not show negligence in Upton, because Adams was shown to have been competent, and had had abundant means to become acquainted with the road. 4. That if there were any defects in the time tables calculated to work injuriously, the defect, in this case, was caused by specific instructions to the engineer, and by the engineer's own knowledge of the facts. The motion was denied, and the defendant excepted.

The judge charged the jury, among other things, that if they should find that the injury was occasioned by the negligence of the defendants they were at liberty fully to compensate the plaintiff not only for his loss of time, expenses and trouble, but for the pain and suffering he had endured, in consequence of the injury. That it was the duty of the defendant to use reasonable care in order to employ an engineer of competent skill and experience; and if the jury should find that Upton did not use ordinary care in that respect in providing the engineer on the occasion in question, and the injury was occasioned by such negligence, the defendant was liable

for the consequences. The defendant excepted to the charge, upon each of these propositions. Verdict for the plaintiff, for $2500.

*J. H. Martindale*, for the plaintiff.

*T. Hastings*, for the defendant.

*By the Court*, MARVIN, J. No error was committed in allowing the plaintiff to testify as a witness in his own behalf, though the defendant was a corporation. It is true that the code limits the right of examination to cases in which the adverse party or person in interest is living. It is said that the adverse party or person in interest is, in this case, a corporation, and that life, or living, cannot with propriety, be applied to corporate existence. It may well be that the present case did not occur to the legislature, when the statute was enacted; but the design was to admit, as a witness, a party to an action whenever the adverse party or person in interest could also be a witness. A corporation could never be a witness, but a corporation is composed of a person or persons, who are natural persons and are interested in the corporation, and they can be witnesses. I have no doubt the code (§ 399) should be so construed as to admit a person who has an action with a corporation, to be a witness in his own behalf.

It was not error to admit evidence to show the state of the plaintiff's leg after the second breaking. Evidence of the second breaking had been given without objection, and it was important that the jury should know the condition of the leg before and after the second breaking, in order that they might be able to determine for what injury the defendant was liable. It was not claimed that the defendant was liable for any injury other than that which happened at the time of the collision.

Was any error committed in the charge to the jury? It is settled law in this state, that a principal is not liable to a servant for injuries sustained by reason of the negligence of

another servant, when both are engaged in the same general business, in the service of the principal. (*Coon* v. *The Syracuse and Utica Rail Road Co.*, 1 *Selden*, 492.) This principle was conceded in the present case, by the plaintiff, who claimed to recover on account of the negligence of Upton, its managing agent. If the servant is injured by reason of the negligence of the master, the latter is undoubtedly liable.

As the general business of managing a train of cars upon a rail road requires the co-operation of many persons, and as they are supposed to know the risks incident to the business, they voluntarily take those risks at the time they enter into the employment of the rail road company, and the compensation to be paid them may be affected by the character of the business. As one servant may be injured by the carelessness of a fellow servant, he takes this risk. The business requires all the servants, and some one or more of them, though possessed of sufficient skill and capacity, may, on some occasion, be careless and negligent, and a fellow servant may be injured in consequence. In such a case, the master or principal is not responsible. But it may be that one of the servants, employed by the master, to co-operate with the other servants, is incompetent, and lacks the requisite skill to perform his part of the work. He may be a careful, prudent servant, but from ignorance of his duties, or from the absence of the necessary skill, may be unable to perform them, and a fellow servant may sustain injury in consequence of his incompetency. Is the principal then liable? It is, I have no doubt, the duty of the master, to all his servants, to use reasonable care in providing them with careful and competent fellow servants, and he is liable for injuries to any servant arising from his neglect to use such care, in the absence of proof that the injured servant was aware of the incompetency of his fellow servant. If the injured servant has knowledge of the incompetency and want of skill of his fellow servant, a presumption may arise that he consents to take upon himself the risk of any injury which may result from such incapacity. He may, if the mas-

ter employs an incompetent co-laborer, quit his employment; unless the master will, upon notice, discharge the incompetent servant.

As the master or principal has the sole right to employ all his servants, each servant has the right to rely upon the master's using reasonable care and diligence in employing none but competent servants. The power to employ servants may be delegated by the principal, and this must generally be so, when the principal is a corporation. When the principal thus acts by an agent he will, upon general principles, be liable for the negligence of the agent. This agent will not be regarded simply as a fellow servant of those whom he employs in the general business. (*See Pierce on Am. Rail Road Law, ch. 13, and the cases there cited; Keegan* v. *The Western Rail Road Corporation,* 4 *Selden,* 175.)

In the present case, Upton had authority to employ the engineers. He was the managing agent. He employed Adams. There can be no reasonable doubt that the injury to the plaintiff was caused by the carelessness and negligence of Adams. He left the bridge at 9 o'clock 30 minutes and ran to Pekin, $8\frac{1}{2}$ miles, in a fraction over 10 minutes. He failed to arrest the progress of the train in time, and the collision occurred before the up train could run upon the switch. He must have run east beyond the east end of the switch. But the liability of the defendant does not depend upon the negligence of Adams. The questions presented are, 1. Was Adams incompetent? 2. If so, was there negligence in Upton in employing him and putting him in charge of that train, as engineer? Waiving the question arising out of the time tables, both of the questions here presented must have been found in the affirmative before the plaintiff could recover. The defendant did not warrant that Adams was competent. If Upton, as the managing agent of the defendant, used proper care, in employing Adams and placing him in charge of the train, the defendant is not liable. As I understand the charge, it was in accordance with the views here presented. The learned judge

instructed the jury that it was the duty of the defendant to use reasonable care in order to employ an engineer of competent skill and experience; and if the jury found that Upton did not use ordinary care, in that respect, in providing the engineer on the occasion of the collision in question, and the injury was occasioned by such negligence, the defendant was liable for the consequences. It may be said that this proposition does not include the question of the *competency* of Adams; or rather, perhaps, that it assumes that he was incompetent and makes the question turn upon the care and diligence of Upton in employing him. The duty of Upton is properly stated; and then follows the proposition that if such duty was not performed, and the *injury was occasioned by such negligence,* then the defendant was liable for the consequences. The duty was to use reasonable care in order to employ an engineer of competent skill and experience. If, in fact, Adams was competent, skillful and experienced, then there was no want of proper care on the part of Upton. The jury must have fonnd that Adams was incompetent, and that Upton did not use reasonable eare in employing him. If the charge failed to present, fully and clearly, the principles involved, the defendant should have requested further instructions. In my opinion we cannot say that the charge, as it is, was erroneous.

The proposition that if the injury was occasioned by the negligence of the defendant, the plaintiff could recover, is sound. It has referenee, I suppose, to the question arising out of the time tables.

In my opinion no error was committed by the court; unless it was error to refuse to nonsuit the plaintiff. And I shall consider this question briefly, in connection with the motion now made for a new trial upon the ground that the verdict is against evidence. Aside from the question growing out of the time tables, I confess that I am not satisfied with the verdict. The question turns upon the competency of Adams, assuming that Upton was negligent. As to his competency, I certainly should have been better satisfied if the jury had found Adams

competent. He had served as an engineer some four years, and he had been in the employ of the defendant 19 months, but not on the road from the bridge to Rochester. He had, however, as engineer, run over the road a dozen times, in the 19 months, and had ridden on the cars at other times. He had run up to the bridge with a freight train, the night before. Several witnesses of the defendant, engineers, state facts tending strongly to show that such an acquaintance with a road was amply sufficient. Adams, upon whose evidence as to his competency the case of the plaintiff rests, puts his incompetency upon the sole ground of a want of sufficient acquaintance with the road to enable him to run the train safely in the night. He says that he should want three weeks' knowledge of the road by running every day, to get acquainted with it. His remark to Upton, if he made it, that he did not feel competent to take the train over the road at night, is very slight evidence to prove the fact of incompetency. If he did so feel, it might be evidence of a want of confidence in himself. Upton denies that Adams made any such remark, and Jackson, who was present, does not in his evidence speak of any such remark. They both say that Adams said he thought it was laying it on some too thick, after coming with a freight train; thus complaining, &c.

Was Upton negligent, in employing Adams? He was first employed 19 months before, upon the recommendation of three master mechanics and foremen for rail road companies. He had served the defendant for more than a year and a half as an engineer, and so far as we learn, with skill, giving abundant evidence of competency. Was Upton negligent, when he relied upon his knowledge of Adams as an engineer? But here comes in, and undoubtedly with telling effect upon the jury, the remark of Adams to Upton that he did not feel competent to take the train over the road at night; thus, as it was probably argued, showing that Upton had notice of Adams' incompetency, and that he therefore did not use reasonable care in employing him in that service.

If the question raised by the time tables was not in the case, I am inclined to think that the verdict ought to be set aside as being against the evidence. I think the decided weight of the evidence is adverse to the positions that Adams was incompetent; or that Upton did not use proper care and diligence in entrusting the train to him. But the case is embarrassed with the question growing out of the time tables. By them the approaching trains were to arrive at Pekin at the same moment. It is true that the up train was to run on to the switch or side track, and Adams had instructions to stop, and if the up train had not arrived, to wait five minutes. If the trains should reach Pekin at the same time, and one of them should go on to the side track and the other remain on the main track, no collision could happen. But suppose the down train should arrive one or two seconds sooner than the up train, and should not be stopped precisely at the right spot, but should run past the east end of the switch, a collision would most likely occur. This was precisely what happened in the present case.

It appears from the testimony of Adams that there were two switches at Pekin; one at the east end of the station, and one at the west. I suppose there was but one side track. What the length of this side track was does not exactly appear. Carpenter says that when he stepped out, they might have been over the switch a rod. This was perhaps 300 feet west of the stopping place. Adams had not, at that time, signalled to brake. I infer that the side track was between 600 and 700 feet in length, and Adams ran the whole length and some further. Now so far as the defendant is concerned the question is presented, was it negligence to require or permit approaching trains to reach this station at the same moment? And this was a question of fact to be solved by experience in running trains. If there is no difficulty in stopping the train at the proper place, and no danger of running by at any time, including the night, then timing the trains in this manner would not be negligence; assuming, of course, that the up

train should run on to the side track.   But if experience shows that there is danger, especially in a dark night, of the down train running by the east switch, then it would be gross negligence to provide for the arrival of the trains at the same moment, as there would be great danger of a collision.   The case is quite meagre of evidence touching the question of the danger of running by.   We have the evidence of what actually occurred in this case.   Adams says: " The night was damp and foggy ; on reaching Pekin I saw a train; it appeared to me to be on the switch, coming west.   I mean the side track off the principal track.   I thought it was stationary.   I had got about half way opposite the station, which is about the middle of the side track, before I discovered that the other train was not on the side track.   I had shut off steam, and down brake, and reversed my engine ; but not within sufficient time to avoid collision."

Upon the whole, I have come to the conclusion to let the verdict stand.   I cannot say that it is so against the evidence upon all the controlling questions in the case as to require that it should be set aside.

Judgment affirmed.

[ORLEANS GENERAL TERM, September 13, 1858.   *Grover, Marvin* and *Davis,* Justices.]