[No. 6,847.—Department Two, and in Bank on rehearing.]

## JENNIE BEESON v. THE GREEN MOUNTAIN GOLD MINING COMPANY.

MASTER AND SERVANT—NEGLIGENCE.—The law implies, as part of the contract of service, that the servant assumes all the ordinary risks of personal injury, except the negligence of his employer, incident to the business, including risks from the negligence of other servants in the same business, when ordinary care is used to select only such as are prudent and capable; and that the employer engages, on his part, that he will use ordinary care as well in the selection of laborers as of machinery and appliances; and this includes the obligation to keep in repair.

ID.—ID.—The servant also assumes special or unusual risks where he either knows them, or it is his duty in the course of his employment to know them.

ID.—ID.—FELLOW-SERVANT—DEFINITION.—One to whom the employer commits the entire charge of the business, with power to choose his own assistants, and to control and discharge them, is not a *fellow-servant* with those employed under him, and the master is answerable to all the under-servants for the negligence of such managing assistant, either in his personal conduct within the scope of his employment, or in his selection of other servants.

ID.—ID.—ID.—In an action by a wife for damages for the death of her husband, occurring in the employment of the defendant, it appeared that the death was caused by a fire originating from a defective pipe, put up under the supervision of the defendant's superintendent; and it did not appear that the deceased knew or had reason to know of the defect. *Held*, that the superintendent was not a fellow-employee of the deceased in the sense intended by § 1970 of the Civil Code; and that the work of putting up the pipe, being done under his supervision, was the same as though done by him in person; that the deceased had a right to rely upon the implied engagement of the defendant that the pipe was properly placed and constructed, and that the defendant was therefore liable.

ID.—ID.—DAMAGES—INSTRUCTIONS.—*Held*, further, that it was not error for the Court to instruct the jury, that, in determining the amount of damages, they had the right to take into consideration the relations proved as existing between the plaintiff and deceased at the time of his death, and the injury, if any, sustained by her in the loss of his society.

Id.—Id.—Id.—Id.—The rulings of the Court in giving and refusing certain instructions in regard to the liability of employers for injuries to employees, occurring in the course of their employment, considered and *held* to be correct.

APPEAL from a judgment for the plaintiff, and from an order denying a motion for a new trial, in the Second District Court, County of Plumas. CLOUGH, J.

*J. D. Goodwin, J. S. Chapman,* and *Cope & Boyd,* for Appellant.

The evidence does not question the competency and care of defendant's superintendent in the conduct of the business, and proves that he was authorized to employ, and did employ, all other workmen about the mine; and also that the defendant furnished him with all suitable material for constructing needed appliances for carrying on the business. This is all that the law requires of the defendant in the premises. (Civ. Code, § 1970; *Yeomans* v. *Contra C. S. N. Co.* 44 Cal. 81; *Hogan* v. *Central Pac. R. R. Co.* 49 id. 130; *Gay* v. *Winter,* 34 id. 153; *Collier* v. *Steinhart,* 51 id. 116; *Chicago etc. R. Co.* v. *Harney,* 28 Ind. 22; *Same* v. *Swett,* 45 Ill. 197; *Wright* v. *N. Y. Central R. R. Co.* 25 N. Y. 566; Shearman & Red. on Neg. §§ 86, 87.)

When the master does not undertake the duty of furnishing or adopting the appliances by which the work is to be performed, but this duty is intrusted to or assumed by the workmen themselves within the scope of their employment, he is exempt from responsibility, if suitable materials are furnished, and suitable workmen are employed by him, even if they negligently do that which they undertake. (*Kelley* v. *Norcross,* 121 Mass. 509; *Zeigler* v. *Day,* 123 id. 152; *Colton* v. *Richards,* id. 484; *Smith* v. *Lowell M. Co.* 124 id. 114; *Morse* v. *Glendon Co.* 125 id. 282; *Killea* v. *Faxon,* id. 485; *McLean* v. *Blue P. G. M. Co.* 51 Cal. 256.)

The deceased knew, or had the opportunity of knowing, much better than the defendant, the condition of the machinery and pipe, and of all the dangers to which he was exposed in working in the mine, and therefore assumed all the risks. (*McGlynn* v. *Brodie,* 31 Cal. 376; *Malone* v. *Hawley,* 46 id. 409; Story

on Agency, § 453; *Coombs* v. *New Bedford Co.* 102 Mass. 585; *Winship* v. *Enfield*, 42 N. H. 197; *Loonam* v. *Brockway*, 28 How. 472; *Mad River R. R. Co.* v. *Barber*, 5 Ohio St. 541; *Dewitt* v. *Pac. R. R. Co.* 50 Mo. 302; *Buzzell* v. *Laconia M. Co.* 48 Me. 113; *Mehan* v. *Binghampton R. Co.* 73 N. Y. 585; *Hayden* v. *Smithville M. Co.* 29 Conn. 548; *Senior* v. *Ward*, 1 El. & E. 385.)

If the evidence tended to show any negligence, it was the negligence of the fellow-servant of Beeson, and not of the defendant. (*Collier* v. *Steinhart*, 51 Cal. 116; *McLean* v. *Blue P. G. M. Co.* id. 256; *O'Connell* v. *Baltimore & O. R. R. Co.* 20 Md. 212; *Thayer* v. *St. Louis etc. R. R. Co.* 22 Ind. 26; *Warner* v. *Erie R. R. Co.* 39 N. Y. 468; *Wilson* v. *Madison*, 18 id. 226; *Sherman* v. *Rochester etc. R. R. Co.* 17 id. 134, 153; *Wright* v. *Same*, 25 id. 564, 462; *Weger* v. *Penn. R. R. Co.* 55 Penn. 460; *Ryan* v. *Cumberland V. R. R. Co.* 23 id. 384; *Coon* v. *Syracuse R. R. Co.* 5 N. Y. 492; *Gibson* v. *Erie R. R. Co.* 63 id. 452; *Burke* v. *Norwich etc. R. R. Co.* 34 Conn. 474; *Farwell* v. *Boston etc. R. R. Co.* 4 Met. 49; *Carle* v. *Bangor etc. R. R. Co.* 43 Me. 269.)

Beeson was required to use extraordinary care to save himself from the threatened danger. (*Gay* v. *Winter*, 34 Cal. 163; *Fitch* v. *Allen*, 98 Mass. 572; *Sprong* v. *Baltimore & Albany R. R. Co.* 60 Barb. 30; *Corbin* v. *American M. Co.* 27 Conn. 274.)

The Court erred in permitting testimony as to the affectionate bearing of the deceased towards her during their married life. (Shearman & Red. on Neg. § 612; Sedgwick on Damages, 646, and cases there cited.)

The Court will observe that no such expression as *fellow-servant* is to be found in the statute. If that or any kindred expression had been used, the natural inference would be, that the statute was merely intended as declaratory of the common law, and the question would then be open as to what the rule of the common law is. But the language of the statute seems to have been chosen with direct reference to the conflicting decisions on this question, and for the purpose of furnishing a rule certain in itself, and excluding the idea of equality of service as a test of the liability of the employer.

The position taken by the Court deprives the statute of any force or effect, and makes it a mere idle enactment. For all practical purposes, it might as well be repealed.

Having thus stated our views of the statute, we desire to call attention to the following cases in which the same views are expressed: *Collier* v. *Steinhart*, 51 Cal. 116; *McLean* v. *The Blue Point Gravel Mining Company*, id. 255; *McDonald* v. *Hazletine*, 53 id. 35.

*W. W. Kellog*, and *R. H. F. Variel*, and *John .C. Hall*, for Respondent.

The negligence of another person employed by the same employer in the same general business means such negligence as the culpable employee commits in the performance of the *particular duties* he undertook to discharge *toward the master alone.*

The duty which the master is bound to discharge toward his servants, such as furnishing and maintaining safe and proper machinery and appliances, etc., he must use ordinary care to discharge; and he cannot claim immunity from liability because he has authorized his agent or employee in the same general business to do it for him. And where the master is a corporation, as is the fact in the case at bar, the principle contended for receives further support. Where a corporation is the master, its general agent, within the scope of his authority, is to be considered in respect of those duties which it is incumbent upon the master to discharge toward its servants, and which the master nas deputed the agent to perform for it, the representative *pro hac vice* of the corporation. He is the corporation personified—the *alter ego* of the corporation—and his acts are the acts of the corporation, his negligence is the negligence of the corporation, and notice to him is notice to the corporation. (*Corcoran* v. *Holbrook*, 59 N. Y. 517; *S. C.* 17 Am. R. 369; also *Laning* v. *N. Y. C. R. R. Co.* 49 N. Y. 521; *S. C.* 10 Am. R. 417; and especially, *Malone* v. *Hathaway*, 64 N. Y. 5; *S. C.* 21 Am. R. 576–578.)

We do not believe that the former Supreme Court intended that the doctrines announced in *McLean* v. *Blue Point Mining Company*, 51 Cal. 255, should reach a case like the one at bar,

or should defeat a recovery in one like the present. The appellant claims that that case covers this one. We think not. But if it did, we should say, in reply, that *McLean* v. *Blue Point Mining Company* is not law. Its loose general language, unwarranted by the facts, has led the appellant to conceive that it is not responsible for its own default in furnishing safe machinery, and in the discharge of those other primary and absolute duties which the law imposes upon the. master. If that be true, then the sooner *McLean* v. *Blue Point* is overruled, the sooner we will return to those safe and substantial principles which protect equally the master and the servant.

The latest work on negligence, in speaking of § 1970 of our Civil Code and the decisions under it, upon which the appellant relies, says :

" This statute, it will be perceived, is simply an affirmance of the rule of the common law. But it has received a construction which is contrary to the views of many American courts as to what the common law is. These courts, as we shall hereafter see, hold, that, where the master delegates to an agent the entire control of his business, including the power to employ and discharge servants, such agent is not a fellow-servant with those whom he employs, but is the representative of the master in such a sense that his negligence is the master's negligence." In construing this statute, the Supreme Court of California ignores this rule. (Thompson on Negligence, vol. ii, p. 997. See also *Hough* v. *Railroad Company*, 100 U. S. Sup. Ct. 213 ; *Ryan* v. *Fowler*, 24 N. Y. 410 ; *Flike* v. *B. & A. R. R. Co.* 53 id. 549 ; *Laning* v. *N. Y. C. R. R. Co.* 49 id. 521 ; *Keegan* v. *W. R. R. Co.* 4 Seld. 175 ; *Plank* v. *R. R. Co.* 1 N. Y. Sup. Ct. 319 ; *Mullan* v. *P. & S. M. Co.* 78 Pa. St. 25 ; *Noyes* v. *Smith et al.* 28 Vt. 59 ; *C. & N. W. R. R. Co.* v. *Swett*, 45 Ill. 197 ; *Chamberlain* v. *M. & M. R. R. Co.* 11 Wis. 238 ; *Le Clair* v. *St. P. & P. R. R. Co.* 20 Minn. 9 ; *L. & N. R. R. Co.* v. *Collins*, 2 Duval, 114 ; *Mann* v. *Oriental Print Works*, 11 R. I. 152 ; *C. C. & C. R. R. Co.* v. *Keary*, 3 Ohio St. 201 ; *Shanny* v. *Androscoggin Mills*, 66 Me. 420 ; *Colorado Cen. Ry. Co.* v. *Ogden*, 3 Colo. 499 ; *Cayzer* v. *Taylor*, 10 Gray, 274 ; *Booth* v. *B. & A. R. R. Co.* 73 N. Y. 38.) The last two cases hold, that contributory negligence of a fellow-servant is no defense.

All the matters which the Court authorized the jury to consider are proper constituents of damage. (*Tilley* v. *H. R. R. Co.* 29 N. Y. 252; *Holyoke* v. *G. T. R. Co.* 48 N. H. 541; *Railroad Company* v. *Mahony*, 7 Bush, 235; *Porter* v. *H. & St. J. R. R. Co.* Reporter, vol. ix, p. 549; *Goodman* v. *Penn. Ry. Co.* 62 Pa. St. 329.) In the last case, the Court held, that "the plaintiff's loss was to be measured by a just estimate of the services and companionship of the wife." To the same effect is *Railroad Company* v. *Barron*, 5 Wall. 90; *Taylor* v. *W. P. R. Co.* 45 Cal. 323.

Special attention is asked to two recent Virginia cases construing statutes similar to ours.

The first case is that of *B. & O. R. R. Co.* v. *Wightman's Adm'r*, 29 Gratt. 431. The Court uses this clear and salutory language:

"The statute is regarded by the courts as remedial in its character—as affording compensation unknown to the common law—and is to be liberally construed to promote the objects the Legislature had in view; and therefore it is, the courts look to the relationship and dependent condition of the parties, the capacity and ability of deceased, mental and physical, and, indeed, all the surrounding circumstances and situation of the family to enable the jury properly to estimate the loss sustained, and fix the measure of the damages. The evidence offered by the plaintiff in this connection, and upon which the instructions were based, was properly received, and the instructions properly stated the law for the guidance of the jury."

This decision fully justifies instruction 6 given in this case at the request of respondent. But the second Virginia case, *Matthews* v. *Warner*, 29 Gratt. 570, goes still further.

In this case, the defendant asked the Court to instruct the jury that they could not take into consideration "the mental suffering" occasioned by the death of the deceased to his mother. The instruction was refused. On appeal to the Court of Appeals, the Court gave a full interpretation to the statutes so clearly and satisfactorily as not only to defend the respondent's 6th instruction, but to show, that, under our statute, we were entitled to still more favorable instructions.

The Court said: "The statute of New York, and of all the

other States modeled upon the English statute, are found to be in the following terms, or those of like import: ' The jury may give such damages as they may deem fair and just compensation (not exceeding a specified sum) with reference to the *pecuniary injuries* resulting from such death to the parent, next of kin,' " etc., etc.  In our statute, instead of these words or words of like import being employed, it is declared that " the jury in any such action may award such damages *as to it may seem fair and just,*" etc.  Certainly, in the Virginia statute there are no words of limitation, as in the English statute and those modeled thereon, confining the jury in the assessment of damages to merely pecuniary injury; but, by the very terms of the statute, the damages are such " as to the jury may seem fair and just."  We are bound to presume that the Legislature which enacted this law was familiar with the English statute, and those of the other States of the Union, and of the English and American decisions under them.  And it is a most significant fact, that, with the English and American statutes before them, and familiar with the decisions under them, the Legislature, after following the English statute and the New York statute up to the point where the measure of damages in the one case is declared to be " proportioned to the injury," and in the other " with reference to the pecuniary injuries resulting from such death," at that point discarded these terms, and in lieu thereof adopted the language, " such damages as to the jury may seem fair and just."  We must conclude that it was done with a design, and that that design was, by all the recognized rules of construction, to declare that, in an action for the death of a party caused by the wrongful act, neglect, or default of any person or corporation, such damages may be recovered " as to the jury may seem fair and just."

MYRICK, J.:

This is an action brought under § 377 of the Code of Civil Procedure, by the widow of one George Beeson deceased, to recover damages for negligently causing the death of deceased. The jury returned a verdict in favor of plaintiff for $8,000 damages.  Upon the trial, when plaintiff rested her case, defendant moved for a nonsuit, which was denied.  As the questions in-

volved in the motion are similar to those involved in the instructions given and refused, we consider them together.

The defendant, a corporation, was engaged in quartz-mining in Plumas County, its principal place of business being in the city and county of San Francisco, where its directors resided. In September, 1876, the defendant, by its board of directors, duly appointed one C. G. Rodgers the superintendent of its mining operations at the mine; and from that time until the death of Beeson, said Rodgers remained the duly appointed and acting superintendent of the mine, with full and sole authority to employ and discharge men in relation to said mining, and to manage and conduct the affairs of the corporation at the mine. The engine, pump, and pipe mentioned in the complaint were placed in the mine under the direction and superintendence of said Rodgers. One B. F. Rodgers was the foreman of the mine, and it was his duty to set the men at work and to oversee them.

There are two ledges in this mine, a few feet apart. There are two tunnels running in on one of the ledges, the tunnels being three hundred feet apart; and between the tunnels are levels.

Below the lower or main tunnel is an incline leading to a lower level. The ledges dip at an angle of about 52 degrees. The engine, boiler, and pump were placed in the mine to raise the ore and water from the lower level to the main tunnel, through which they were conveyed to the open air. The boiler and engine were in what is called the engine-room, on a level with, and one hundred and fifty feet from, the main tunnel, and were approached from it. The pipe from the furnace was of the ordinary stovepipe sheet-iron, eight inches in diameter, and extended up from the machinery at an angle of 52 degrees, for a distance of thirty or forty feet, where there was an elbow; thence horizontally fifteen or twenty feet; thence up at an angle of 52 degrees to the upper tunnel, a distance of three hundred feet, where it connected with a wooden box leading along the upper tunnel to the open air. The pipe was riveted in sections of eight feet. The sections were slipped together at the ends, like ordinary stovepipe, but without rings to prevent the pipe slipping together when affected by heat or otherwise; in some places it was slit at the ends of the sections, so that it would go together. In places it was hung on wires suspended from the caps; in places it was supported by wires

fastened to the posts; and in places it rested on the rock at the bottom of the stopes and levels. A number of slides were constructed at the elbows for the convenience of removing ashes and soot. The pipe was placed at sufficient distances from the timbers to be safe, unless it came apart or the soot in it took fire, except at one point, about thirty or forty feet above the engine, where the fire was first discovered; at this point the pipe was only an inch from the lagging or spiling, through which a hole had been cut in order to run the pipe. Some time before the fire, Pierce, a tinner, was employed by the superintendent to take down the pipe then in the mine, and make and help put up the pipe herein spoken of. All the materials, assistance, and tools were furnished by the defendant, through its superintendent, and it was placed by Pierce and his assistants as directed by the superintendent and under his supervision. Pierce told the foreman, B. F. Rodgers, that the pipe at the point thirty or forty feet above the engine was too near the lagging, and that the lagging must be cut out. About ten days before the fire, some change was made at or near that point, and it was at that point that the fire was discovered. The pipe, when in use, became sometimes very hot for the first fifty feet of its length. It had also been known to come apart. It was the duty of the engineers to go over the pipe and watch it. It was also watched by the superintendent and foreman, being known by them to be unsafe. Beeson had worked in the mine some months previous to the occurrence, and had been discharged; for several days he worked above ground; and on the day before the fire he went to work in the mine under the foreman. It does not appear that Beeson had any knowledge as to whether or not the pipe was insecure. He worked in a stope running from ·the main tunnel towards the level above. On his way to and from his work, he passed along the main tunnel, past the entrance to the engine-room, some one hundred and fifty feet from the engine. He had no occasion to go to any other part of the mine than along the main tunnel to the stope where he worked; and along that tunnel was his usual and most convenient way of egress.

At the time of the fire, the foreman was in an upper level; he went down to the fourth level towards the place where Beeson was at work, and found the smoke so dense that the light of

his candle was put out.   He says: "I started to go into the stope Beeson was working in; I couldn't go more than fifteen to thirty feet."   One of the men, in escaping, called out in warning to Beeson, and thought he replied, but it does not appear that Beeson understood the warning.   His body was afterwards discovered in the main tunnel, between his place of work and the outlet.   The bodies of two or three other men were also discovered in some of the stopes.   It was admitted by the pleadings, that Beeson was a prudent man, and in good health.

The theory of the defense is:

1. The superintendent, foreman, and tinner were all fellow-servants with Beeson, within the meaning of § 1970 of the Civil Code, and therefore the defendant is not liable for the acts or omissions of either of them, unless the plaintiff has shown lack of ordinary care on the part of defendant in the selection of the culpable fellow-servant.

2. Beeson had the opportunity of knowing whatever danger attended the business, and he worked in the mine at his own risk.

The general principles of law applicable to this case may be briefly stated:

The law implies, as part of the contract of service, that the servant agrees to and assumes all the ordinary risks of personal injury, without the negligence of his employer, incident to the business, including risks from the negligence of other servants in the same business, when ordinary care is used to select only such as are prudent and capable; and that the employer engages on his part that he will use ordinary care as well in the selection of laborers as of machinery and appliances.

The master, whether a corporation or an individual, is bound to furnish its employees safe materials and structures.   This includes the obligation to keep in repair.   The employee has a right to presume that the master has discharged this obligation. The ordinary perils of the business, the employee assumes; also any special injury, where he knew of the conditions causing the injury, or where it would be his duty to know them in the ordinary course of his employment.   But he is not bound to know of any defect or omission, and assumes no risk therefrom, if it were practically impossible or unusual for him to ascertain all

the special perils. (*Ill. C. R. R. Co.* v. *Welch*, 52 Ill. 183; *Noyes* v. *Smith et al.* 28 Vt. 59.)

If there be ordinary perils incident to the business, or perils arising from the acts or omissions of fellow-servants, the latter being employed with the exercise of ordinary care on the part of the master, or perils within the knowledge of the employee, the employee has the option to continue his work with the risks, or cease work, and thus end the risk. A corporation is liable to an employee for negligence of its agent intrusted with the performance of duties which the corporation should perform as master. As to such acts, the agent occupies the place of the corporation, and the latter is deemed present and consequently liable for the manner in which the acts are performed. (*Flike* v. *B. & A. R. R. Co.* 53 N. Y. 549.) In this case, three brakemen were necessary to properly handle the train; three were engaged to go with the train; two only presented themselves, the third not appearing. Instead of putting another in the place of the third, the train was dispatched by the authorized agent with two brakemen, and two being unable to handle the train, the accident occurred to the plaintiff, an employee.

An officer having charge of a department of business is the person required to use that degree of diligence in the selection of competent employees, machinery, and appliances which is necessary to exempt a company from liability for their negligence. (*Frazier* v. *P. R. R. Co.* 38 Pa. St. 104; *Williams et al.* v. *Cartter*, 52 Mo. 372; *Shulters* v. *Johnson*, 28 Barb. 80.) Corporations are liable for injuries arising from the negligence or carelessness in agents and officers in the course of their employment, the same as individuals. (*P. & F. W. & C. Ry. Co.* v. *Devinney*, 17 Ohio St. 201.)

Whenever the nature of the business is such as to involve the appointment of subalterns by middlemen, and to withdraw the principal from the management of the business, then the principal is liable for the negligence of the middleman in making the appointments, on the ground that the negligence is that of the principal, and not of a fellow-servant of the plaintiff. A *fortiori* is this the case where the middleman has direct authority to make such appointment; otherwise, it is hard to see in what case a corporation, which appoints and dismisses only through

a general superintendent, can be liable for negligence.   (Wharton on Neg. § 241.)

We are aware, that in at least one State the decisions are the reverse of the above, but we think the weight of authority and the better reason are with the principles we have stated.

" One to whom his employer commits the entire charge of the business, with power to choose his own assistants, and to control and discharge them as freely and fully as the principal himself could, is not a *fellow-servant* with those employed under him; and the master is answerable to all the under-servants for the negligence of such managing assistant, either in his personal conduct within the scope of his employment, or in his selection of other servants.   Such, at least, appears to us to be the rule, sanctioned by the weight of authority and by sound reason, though it must be admitted that it is not everywhere established by law.   The contrary rule prevails in Massachusetts."   (Shearman & Red. on Neg. § 102.)

Let us apply these principles to the case in hand.   The superintendent, although in the employ of defendant, was not a fellow-employee with plaintiff, in the sense intended by § 1970, Civil Code.   For the purposes of managing the business, determining what machinery should be used and how placed, what men should be employed, and how much paid, he was the defendant.   He was its mouthpiece and hand.   He selected the materials of which the pipe was to be constructed; knew, or ought to have known, whether it was sufficient for the purposes for which it was intended (except as to latent defects in the material); knew, or ought to have known, whether it was safe to be placed within an inch or two of wood.   Beeson, in going to or from his work, passed along the main tunnel.   He was not bound to know whether a defect existed in the machinery or appliances not within his view on the way; he was not bound to explore the windings of the pipe; he had a right to rely upon the implied engagement of the defendant, that it was properly placed and constructed.   Pierce, the tinner, in performing his share in the work, was not a fellow-employee of plaintiff.   It appears, that his work was done under the supervision of the superintendent, and he was directed when and how to place the pipe, and the materials were furnished to him; therefore, as to

such acts, it is the same as if the superintendent had in person done the work.

The Court instructed the jury, among others, as follows :

" 1. If you believe, from the evidence, that C. G. Rodgers was authorized by the defendant to lay the pipe and put in position the engine and boiler referred to in the testimony of witnesses, and that everything was left to his direction and uncontrolled discretion as to the character of appliance to be used about defendant's mine, and as to what servants should be employed or discharged, then the negligence of C. G. Rodgers in regard to that matter is the negligence of defendant.

" 2. Under the circumstances just stated, you are to consider his acts as the acts of the defendant, so far as he was acting within the scope of matters connected with the management of the mine." There was no error in these instructions.

" 3. The person who laid the pipe in position was not a fellow-laborer with the deceased in the sense of the statute which exempts an employer from liability to one servant for an injury suffered by him from the negligence of another servant in the same general employment." There was no error in giving this instruction, because the pipe was laid under the supervision of the superintendent, who was not therein a fellow-laborer with plaintiff.

" 4. If, therefore, you will find from the evidence that the accident through which Beeson lost his life resulted from an inherent defect in the pipe, which might have been discovered by the exercise of reasonable diligence on the part of defendant, or if you believe that the accident occurred in consequence of want of reasonable care in the mode of laying the pipe in position, or connecting the same, then you shall find for the plaintiff, and assess the amount of damages." There was no error in this.

5. An exception appears to have been taken to this instruction (the 5th), but the transcript does not show by whom.

The following instructions, among others, were given at the request of plaintiff :

" 5. The Court instructs you, that if you believe from the evidence that by reason of the negligence of the defendant, and its failure to exercise ordinary care, the said pipe described in plaintiff's complaint was poorly constructed, and was not safely

calculated to perform the office for which it was designed; and that by reason of the negligence of the defendant and its failure to exercise ordinary care in maintaining the same, it was in such a condition on the 6th day of October, 1878; and that by reason of such condition, so caused by defendant's negligence and want of ordinary care, it became disconnected, or that it got out of order or otherwise became deranged so that it ceased to perform its allotted functions, and so as to set fire to the timbers in the mine, and so as to cause the smoke, gases, and vapors generated in the working of the machinery described in said complaint, and generated in the burning of said timbers, to permeate, be discharged into, and be disseminated through said mine at the time alleged in said complaint, when the said George Beeson was engaged at work as a miner in mining therein; and that from the effect of said smoke, gases, and vapors disseminated through said mine, and through no negligence on his part, the said George Beeson was killed; and that his death, so caused, was not the consequence of the ordinary risks of his employment—then you should find for the plaintiff."

The Court, before giving the preceding instruction, modified it by adding after the word "employment" in the line preceding the last, the following:

"Nor the consequence of the negligence of any other person employed by the same employer, in the same general business in which Beeson was engaged, unless defendant was guilty of negligence in the employment of such persons."

"6. The Court instructs you, gentlemen of the jury, that if your verdict should be for the plaintiff, that then 'such damages may be given by you to plaintiff as under all the circumstances of the case may be just.' And in determining the amount of such damages, you have the right to take into consideration the pecuniary loss, if any, suffered by this plaintiff in the death of said George Beeson; also the relations proved as existing between plaintiff and deceased at the time of his death, and the injury, if any, sustained by her in the loss of his society."

The Court, before giving the preceding instruction, modified it by adding thereto after the word "Beeson," the words, "by being deprived of his support.'

"7. The Court instructs the jury that the ordinary risks of

a business in which one is employed are such risks as the employee is as likely to know as the master. They are such risks as can be as distinctly foreseen and provided for in the rate of compensation as any others, and which are the natural and ordinary incidents of the work the employee agrees to do, and which are liable to happen in the performance of such work, although the employee and his fellow-employees discharge their duties and exercise due care."

" 8. The Court instructs the jury, that if, from all the circumstances proven in this case, you believe that the deceased came to his death from causes arising out of the negligence of the defendant, or its failure to exercise ordinary care, and that such death was not in consequence of the *ordinary* risks of the business in which the deceased was employed, that you should find for the plaintiff."

Before giving the preceding instruction, the Court added, " unless the injury resulted from the negligence of a fellow-servant in the same general employment, or in consequence of the negligence of the deceased."

Among others, the defendant asked the Court to give the following instructions:

" 3. The evidence in this case shows—and there is no contradiction upon this point—that the engine used in the defendant's mine was inside of the mine, not far from the main tunnel, and that the pipe connected with the engine, and from thence conducted smoke to the surface of the mine; that Beeson, the deceased, was at work in the mine; and if you believe from the evidence that the fire in the mine was caused by the pipes becoming disconnected, and if you also believe from the evidence that it was the duty of the engineers to take care of the pipe, and to see to it, and to repair any defects therein, and generally guard against accident from any disconnection of the pipe or other impairment thereof, and that the accident occurred by the neglect of the engineer, or could have been prevented by due care on his part, then you are instructed that the plaintiff cannot recover; that the engineer was a co-laborer in the sense of the rule above laid down, for whose negligence the defendant is not liable in the action for an injury to Beeson resulting from such negligence."

Before giving the preceding instruction, the judge added the following:

"Provided you believe the defendant was not guilty of negligence in the employment of such engineer." The defendant excepted to the modification.

"4. If you believe from the evidence that the pipe was improperly constructed in the first place, and that the workman, George Pierce, was guilty of any negligence in such construction or putting it up, and that by greater care on his part that it could have been rendered more safe, and that if due care had been taken by him in constructing the pipe or in putting it up, the accident would not have happened; but if, on the contrary, you believe from the evidence that the accident occurred by reason of the negligence of the said Pierce in the construction or putting up the said pipe, you should find for the defendant; for in that event, the said Pierce was a fellow-servant, and the defendant not liable for an injury to Beeson resulting from such negligence of Pierce."

"7. You are further instructed, that the deceased assumed all the risks of the business in which he engaged, as it was carried on by defendant, so far as such risks might have been known to deceased by making use of his opportunities and means of knowledge. And therefore, if you believe the machinery was dangerous, either in itself or from the manner in which it was conducted, and Beeson knew, or had the means and opportunities of knowing, the risks to which he was exposed, the plaintiff cannot recover in this action for the injury complained of, though you should believe that the injury resulted from the dangerous character of the machinery, or from the dangerous manner in which the mine was worked."

"8. Every man may conduct his own business in his own way, so he does not violate the law of the land. And he may choose his own machinery, and select his own appliances for carrying on his business; and a servant entering his employment, knowing or having the means and opportunities of knowing the manner in which and the means by which the employer is carrying on the work, has no right to direct that the master adopt another mode or other machinery for carrying on his business; and if any injury happen to t' e servant by reason of

the kind of machinery or appliances by which the work is carried on, or by reason of the manner in which the business is conducted, and the facts were all known to the servant, and the dangers of the service known to him, or he has the means of knowledge of the risks incurred by him, he cannot complain of an injury resulting from such machinery or manner of operating it, though the jury may be of the opinion that the machinery was not proper, or the manner of using it was unsafe."

" 9. If the deceased's own negligence contributed to the injury resulting in his death, the plaintiff cannot recover; and therefore, if you find from the evidence that the mine took fire by reason of the negligence of the defendant, yet if you find that by the exercise of reasonable care and prudence on the part of the deceased he could have escaped from the mine, that he knew of the fire in time to have made his escape, and was not prevented from escaping by any orders or influence of the defendant, then the plaintiff cannot recover."

In our opinion, there was no evidence upon which to base this instruction, and therefore its refusal was not error.

" If you believe, from the evidence, that the defendant exercised due care in constructing its machinery, and that it was operated with care, and all means that reasonable prudence should suggest to avoid accident, and to prevent injury to the workmen, in case of accident, who were employed by the defendant, you should find for the defendant."

This instruction was calculated to mislead the jury, and its refusal was not error.

" If you believe from the evidence that the death of the deceased resulted from the negligence of the superintendent or foreman of the defendant's mine, you should find for the defendant; for the superintendent and foreman were fellow-servants of the deceased, for whose negligence the defendant is not liable."

These instructions were refused, and the defendant duly excepted.

No errors appear in those rulings, and the judgment and order denying a new trial are affirmed.

Sharpstein, J., and Thornton, J., concurred.

A rehearing having been granted, the appeal was heard by the Court in Bank, and Mr. Justice MYRICK delivered the opinion of the Court.

MYRICK, J.:

This case was heard in Department Two of this Court, and the opinion of the Department was filed August 26th, 1880. Subsequently, upon petition by the appellant, a hearing of the case by the Court in Bank was granted, which hearing has been had.  The relations existing between Beeson, the deceased, and the defendant and its superintendent, and the responsibility of the defendant, for the acts and omissions of its superintendent, were considered at length in the opinion of the Department, and being of opinion that the law concerning the same is therein correctly stated, we have nothing further to add upon that branch of the case, except to add *Hough* v. *Railway Company*, 100 U. S. Sup. Ct. 213, to the cases cited.

Another branch, not discussed by the Department, we will here consider; that is, as to the correctness of the following instruction given to the jury by the Court below, viz.:

" 6. The Court instructs you, that if your verdict shall be for the plaintiff, such damages may be given by you to plaintiff as under all the circumstances of the case may be just.  And in determining the amount of such damages, you have the right to take into consideration the pecuniary loss, if any, suffered by this plaintiff in the death of said George Beeson, by being deprived of his support; also the relations proved as existing between plaintiff and deceased at the time of his death, and the injury, if any, sustained by her in the loss of his society."

The appellant contends, that the latter part of this instruction, commencing with the words, " also the relations," etc., is erroneous, for the reason that all damages to be recovered in actions of this character are to be measured by the pecuniary loss sustained by the plaintiff; and that the relations existing between the plaintiff and deceased, and the loss by her of the society of the deceased, cannot be a basis for estimating or affording pecuniary compensation.

The statute of this State (§ 377, Code Civ. Proc.) provides, that, in this class of actions, " such damages may be given as

under all the circumstances of the case may be just." Under this clause, evidence was offered and received as follows:

Question to plaintiff, as a witness on her own behalf: "In regard to the character of your social relations, explain to the jury as nearly as you can what they were." The objection of the defendant was overruled. The answer was: "Our social relations were always pleasant. He never spoke an unkind word or done anything in any way to make me feel badly. He was always kind to me." The instruction above quoted had reference to this testimony.

It is true, that in one sense, the value of social relations and of society cannot be measured by any pecuniary standard; and possibly the Legislature, in enacting § 377, Code of Civil Procedure, may not have intended to give relief in that sense, especially as the words "pecuniary or exemplary," which were formerly in the section, were omitted in the amendment of 1873–74; but in another sense, it might be not only possible, but eminently fitting, that a loss from severing social relations, or from deprivation of society, might be measured or at least considered from a pecuniary standpoint. If the instruction be good from any point of view presented by the case, it should be sustained, unless the party alleging the error asked the Court to give such direction to the instruction as that it could not be aimed at the point of view in reference to which it may be good.

If a husband and wife were living apart, by mutual consent, neither rendering the other assistance or kindly offices, the jury might take into consideration the absence of social relations and the absence of society in estimating the loss sustained by either from the death of the other. So, if the husband and wife had lived together, in concord, each rendering kindly offices to the other, such facts might be taken into consideration; not, as the books say, for the purpose of affording solace in money, but for the purpose of estimating pecuniary losses. The loss of a kind husband may be a considerable pecuniary loss to a wife; she loses his advice and assistance in many matters of domestic economy. In *Penn. R. R. Co.* v. *Goodman*, 62 Pa. St. 339, the Court said, referring to the use of the word "companionship," that "companionship was evidently used to express the

relation of the deceased in the character of the service she performed. The judge merely meant to say, that the loss should be measured by the value of her services as a wife or companion. The form of expression, perhaps, was not the best selection of words, yet it certainly meant no more than that the pecuniary loss was to be measured by the nature of the service characterized as it was by the relation in which the parties stood to each other. Certainly the service of a wife is pecuniarily more valuable than that of a mere hireling. The frugality, industry, usefulness, attention, and tender solicitude of a wife and the mother of children surely make her services greater than those of an ordinary servant, and therefore worth more. These elements are not to be excluded from the consideration of a jury in making a mere money estimate of value."

We think that the social and domestic relations of the parties, their kindly demeanor toward each other, the society, were parts of "all the circumstances of the case" for the jury to take into consideration in estimating what damages would be just, from a pecuniary point of view, especially as there is nothing in the case to show that the jury were instructed that they might give damages by way of solace. (*Matthews* v. *Warner*, 29 Gratt. 570; *B. & O. R. R. Co.* v. *Noell*, 32 id. 394.)

It is not necessary for us to consider the question, discussed by counsel, as to the doubt or ambiguity arising from the use of the words "heirs or personal representatives" in the section above referred to, or to determine, in advance, how any moneys recovered in an action brought by more than one heir should be divided. It is sufficient for this case to state, that the plaintiff, in her complaint, alleged that she was the wife and is the widow and the heir of said deceased, and that there are no living issue of the marriage; and that the defendant did not, either by demurrer or answer, present the point of non-joinder. We may remark, that the statutes of many of the States make provision for the adjustment and distribution among the heirs of the moneys recovered; but the statute of this State is silent upon the subject. When the matter shall be presented, it may be that much embarrassment will be felt in determining how much should go to a widow, how much to a minor, and how much to an adult child, if persons occupying those relations to the deceased should be plaintiffs, or should be entitled to re-

cover. Until such a case shall arise, we have no occasion to consider the question.

Judgment and order affirmed.

SHARPSTEIN, J., THORNTON, J., and McKEE, J., concurred.

MORRISON, C. J., McKINSTRY, J., and ROSS, J., dissented.