MARY E. MILLER, v. SOUTHERN PACIFIC COM-
PANY, Appellant.

**Division One, August 9, 1915.***

1. **PRACTICE: Foreign Tort.** In a suit in a circuit court of this State for damages resulting from a tort committed in another State, all matters of practice are governed and must be determined by the laws of this State.

2. **DEFINITION: Due Care: Negligence.** Due care is a care adjusting itself to the circumstances of the case, and negligence is the absence of that care.

3. **ALIGHTING FROM CABOOSE: Stock Train: Caretaker.** A caretaker, who accompanies and rides in a stock car in a freight train for the purpose of caring for the animals, and who leaves it when it stops in the terminal yards to go to the caboose for

---

*Note.—Opinion filed June 30, 1915. Motion for rehearing filed; motion overruled August 9, 1915.

the purpose of obtaining a block with which to repair a partition in that car, may alight from the caboose anywhere it may be standing within the limits of the yard, unless some local element of unsuitability should appear.

4. ———: ———: ———: **Contributory Negligence.** A caretaker, who is authorized by his transportation contract to ride in the stock car for the purpose of caring for the animals, and who, when the train stops in terminal yards finds that a partition in the car needs repairing and is told by a trainman that he can obtain the block he needs at the caboose, which is the next car, and thereupon leaves his car and safely enters the caboose, and while there, without his knowledge or the knowledge of the experienced brakeman also present, the caboose is moved to an undecked open bridge fifty feet high, of which he knows nothing, and having, four or five minutes later, received the block, and not knowing or being informed that the caboose is on the bridge, turns and leaves it by way of its steps, the time being dark and there being no lights which enable him to see the situation, is not guilty of contributory negligence in stepping off into the dark abyss.

5. ———: ———: ———: **Negligence of Railroad.** A railroad company, which, for its own profit, requires shippers of stock and their caretakers, strangers to its road and yards, to care for the stock in transit, and to get on and off the cars whenever and wherever necessary for that purpose, in the nighttime as well as by day, and without reference to the stations used for receiving and discharging other passengers, the inducement being more of a command than an invitation, is in duty bound to exercise a care for the safety of such caretakers as broad as the peculiar conditions and dangers attending their rightful movements; and does not exercise the high degree of care that the law exacts from a carrier for the protection of the lives of its passengers, when it permits its caboose, which it has invited such caretaker in the performance of his duties to enter, while standing in a place of safety, to be run upon an open bridge over a rocky canyon forming a part of its terminal yards, without warning or other notice of the situation to the caretaker.

6. **EXCESSIVE VERDICT: Under California Statute: $18,000.** The statute of California authorizes the heirs of one negligently killed to recover "such damages as under the circumstances of the case may be just;" and the courts of that State have held that these words confine the recovery to pecuniary damages alone, but that these do not consist simply of compensation for the destruction of legal rights, but include also the loss to the heir of the society, comfort and care of deceased, and the destruction of those kindly relations of which the heir has the

moral right to expect the continuance. *Held*, that a verdict for eighteen thousand dollars for an aged and infirm widow, who lived alone with deceased, an unmarried son aged forty-seven years, a lawyer whose income was from $2500 to $3000 a year, domestic in his habits, spending all his evenings with her and supporting her entirely from his own income, negligently killed in California, is too large by eight thousand dollars.

Appeal from Linn Circuit Court.—*Hon. Fred Lamb*, Judge.

AFFIRMED (*conditionally*).

*Watson, Gage & Watson* for appellant.

(1) The court erred in overruling defendant's demurrer at the close of plaintiff's case, and erred in refusing to instruct the jury at the close of all the evidence to return a verdict for the defendant. Nagle v. Railroad, 88 Cal. 86; Boyd v. Railroad, 105 Mo. 371; Blevans v. Railroad, 3 Okla. 512; Railroad v. Murray, 113 Ga. 1021; Kellogg v. Smith, 179 Mass. 595; Buckley v. Railroad, 161 Mass. 26; Beach on Contributory Negligence, sec. 161; I. C. R. Co. v. Green, 81 Ill. 19; Wallace v. Railroad, 98 N. C. 494; Michell v. Railroad, 51 Mich. 236; Frost v. Railroad, 92 Mass. 387. (2) The court erred in giving instruction number 3 on the measure of damages for plaintiff. Simoneau v. Railroad, 159 Cal. 494; Burk v. Arcadia, 125 Cal. 364; Green v. Railroad, 122 Cal. 563; Pepper v. S. P. Co., 105 Cal. 389; Harrison v. St. Ry. Co., 116 Cal. 156; Morgan v. St. Ry. Co., 95 Cal. 510, 29 Am. St. 123; Duvall v. Hunt, 24 Fla. 85; Hutchins v. Railroad, 44 Minn. 546; I. C. R. Co. v. Crudup, 63 Miss. 291; Jackson v. Traction Co., 59 N. J. L. 925; Mansfield C. & C. Co. v. McEnery, 91 Pa. St. 185, 36 Am. Rep. 662; Vreeland v. Railroad, 227 U. S. 59; Dericksen v. Railroad, 228 U. S. 145; Swift & Co. v. Johnson, 138 Fed. 74; Railroad v. Brown, 26 Kan. 443; In re Calif. Nav. & Imp. Co., 110 Fed. 670; Railroad v. Bayfield, 37

Miller v. Railroad.

Mich. 215; 4 Sutherland on Damages (3 Ed.), sec. 1273; Tiffany on Death by Wrongful Acts, sec. 174. (3) There was no evidence to support the specific acts of negligence alleged in the petition. See authorities under point one. (4) The plaintiff was guilty of contributory negligence in leaving the caboose at the time and place mentioned in evidence. See authorities under point one. (5) The court erred in admitting testimony that the plaintiff was in feeble health and that plaintiff had suffered a very severe injury which had impaired her health. Mahoney v. Railroad, 110 Cal. 471; Green v. Railroad, 122 Cal. 563; Railroad v. Carroll, 84 Fed. 772, 28 C. C. A. 207; Biscuit Co. v. Nolan, 138 Fed. 6, 70 C. C. A. 436; Railroad v. Roy, 102 U. S. 451; Railroad v. Bayfield, 37 Mich. 205; Railroad v. Baches, 55 Ill. 379; Seattle El. Co. v. Hartless, 144 Fed. 379, 75 C. C. A. 317. (6) The damages were grossly excessive. There was no evidence offered showing the amount the deceased had contributed to the support of plaintiff during the years he is alleged to have supported and maintained her. Bourke v. Butte El. P. Co., 82 Pac. 470; Railroad v. Farr, 56 Fed. 999.

*Bresnehen & West* and *Scarritt, Scarritt, Jones & Miller* for respondent.

(1) The case was one for a jury on defendant's negligence and the alleged contributory negligence of deceased. Railroad v. Boring, 51 Ga. 582; Burnside v. Railroad, 107 Minn. 401; Railroad v. Hague, 48 Neb. 97; Otto v. Railroad, 87 Neb. 503; Railroad v. Downing, 16 Tex. Civ. App. 643; Railroad v. Buck, 96 Ind. 346, 49 Am. Rep. 168; Railroad v. McCormick, 124 Pa. 427; Watters v. Railroad, 239 Pa. 492; Railroad v. Eckford, 71 Tex. 274; McGee v. Railroad, 92 Mo. 208; MacDonald v. Transit Co., 108 Mo. App. 105; Zibbell v. So. Pac. Co., 160 Cal. 237; Young v. Railroad, 227 Mo. 307; Porter v. Stock Yards Co., 213 Mo. 372. (2)

Plaintiff's instruction number 3 on the measure of damages was proper and has been approved by the Supreme Court of California. Beeson v. Green Mountain M. Co., 57 Cal. 20; Monroe v. Pacific Coast Co., 84 Cal. 515; Lange v. Schoettler, 115 Cal. 388; Dyas v. So. Pac. Co., 140 Cal. 296; Peters v. So. Pac. Co., 160 Cal. 48; Waddell v. Railroad, 213 Mo. 820. (3) The admission of evidence as to the health of plaintiff and that she had sustained a fractured hip was proper and competent. Evarts v. Railroad, 3 Cal. App. 712; DeWitt v. Paper Co., 7 Cal. App. 774; Simoneau v. Railroad, 159 Cal. 494; Cook v. Railroad, 60 Cal. 604. (4) Evidence as to official positions held by deceased Miller was proper and competent. Taylor v. Railroad, 45 Cal. 323; Beeson v. Green Mountain M. Co., 57 Cal. 20; Lange v. Schoettler, 115 Cal. 388. (5) Plaintiff's instruction number 1 submitting the case to the jury on negligence as alleged was proper. Teale v. So. Pac., 20 Cal. App. 570; Porter v. Stock Yards Co., 213 Mo. 372; Young v. Railroad, 227 Mo. 307. (6) The verdict is not excessive and can only be set aside, unless it clearly appears that the jury was actuated by passion and prejudice. Ruppel v. United Railroads, 82 Pac. 1073; Bowen v. Sierra Lbr. Co., 3 Cal. App. 312; Redfield v. Railroad, 110 Cal. 287; McGrory v. Railroad, 22 Cal. App. 671; Peters v. Southern Pac. Co., 160 Cal. 48; Storrs v. Traction Co., 134 Cal. 91; Evarts v. Railroad, 3 Cal. App. 712.

BROWN, C.—On October 23, 1911, the plaintiff, together with a number of her sons and daughters, brothers and sisters of Frank S. Miller, deceased, filed this suit in the Linn Circuit Court, to recover damages for the negligent killing of the said Miller at Red Bluff, California, on March 23, 1911. The defendant answered, December 26, 1911, pleading, among other things, that by virtue of the provisions of the laws of California, where the alleged cause of action is charged

to have arisen, it is provided that where a party dies without wife or children his father and mother are the heirs next of kin who inherit his property under said laws, and that under said law the mother of said deceased is the only party entitled to sue, and that there was therefore a misjoinder of parties plaintiff.

The plaintiff acquiesced in this, and on June 5, 1912, dismissed as to all the brothers and sisters of deceased, and filed an amended petition with the mother as the only plaintiff. In this it was alleged, in substance, that the defendant was a railroad corporation incorporated under the laws of Kentucky, doing business in Missouri, and having and operating a railroad in California; that it was provided by statute in the last named State as follows: ''When the death of a person, not being a minor, is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death, or if such person be employed by another person who is responsible for his conduct, then also against such other person. In every action under this and the preceding section, such damages may be given as under all the circumstances of the case may be just.'' [Cal. Code Civil Procedure (1906), sec. 377.]

That it was further provided by said statutes that the term person includes a corporation, and that if a decedent leaves no issue or husband or wife the estate goes to his mother and father in equal shares, and if either is dead then to the other.

The petition alleged that the plaintiff was the mother of the deceased, who was a bachelor, and that his father was dead.

It charged that on March 23, 1911, the said Frank S. Miller was a passenger on a freight train of the defendant, acting as caretaker of live stock being transported on said train; that while the train with the caboose attached was standing in defendant's switch

yards at Red Bluff, California, in a safe place on the
level ground, he went into the caboose and there met
the conductor or brakeman; "that while so inside the
caboose with the conductor or brakeman the caboose
and a portion of the train, through the agents and
servants of the defendant, was switched or moved in the
railroad yards of defendant at Red Bluff, and wrong-
fully, carelessly and negligently by defendant, through
its agents and servants, left standing on a high, danger-
ous and unprotected trestle or bridge while it was dark
and in the nighttime; that Frank S. Miller was una-
ware that the caboose had been moved after he had got
onto the same, and left standing on a high and danger-
ous trestle or bridge of defendant which was unpro-
tected by platform, banisters, guards or lights by the
agents and servants of defendant, who wrongfully,
carelessly, and negligently neglected and failed to in-
form said Frank S. Miller that the caboose was stand-
ing on the high, dangerous and unprotected trestle or
bridge, and that it was dangerous to attempt to alight
therefrom, although defendant and its agents and serv-
ants knew, or by the exercise of ordinary care, would
have known, that Frank S. Miller was in said caboose
and was in charge of live stock on said train and might,
or would leave the caboose to attend to and care for
the stock at any time; that Frank S. Miller, not hav-
ing been warned of the position of the caboose and of
the danger of alighting therefrom, was unfamiliar and
unacquainted with the surrounding conditions of the
track and yards of defendant at the place in question,
all of which defendant's agents and servants knew, or
had reason to be aware of, and on account of the dark-
ness of the night, did not discover or ascertain that the
caboose was standing on said trestle or bridge, or that
it was dangerous to alight therefrom, and while the
caboose was standing on said trestle or bridge at night,
attempted, in the presence of the agents and servants
of defendant, or with their knowledge, to leave or alight

from the caboose by means of the steps made at the rear end of said caboose for the purpose of ingress and egress, to attend to his duties as a caretaker of said stock; and when he stepped from the steps, which extended over the ties, track and side of said trestle or bridge, fell a distance of about fifty feet, striking the water, ground and rocks near or under the trestle or bridge, from which he received injuries, resulting in death in the course of a few hours through the wrongful acts or neglect, carelessness and negligence of the defendant and its servants and agents in moving the caboose and leaving it standing on the said trestle or bridge and in the neglecting and failing to warn him that the caboose was standing on the trestle or bridge and of the danger in attempting to alight therefrom and in neglecting and failing to warn him not to get off said caboose, when defendant, through its agents and servants saw, or by the exercise of due care could have seen, him in the act of leaving the caboose, and the peril thereof, in time to have prevented him from stepping from the caboose, and saved his life; and in neglecting and failing to construct and maintain said trestle or bridge with platforms, banisters or guards or lights thereon, as it was its duty to do in order to protect the safety and lives of persons.''

It then alleged that ''on account of the negligent, wrongful and careless acts and neglect of the defendant company, wholly unmindful of its duties to transport the deceased as a passenger on its said train in safety, the deceased came to his death, and that she has been deprived of the care, comfort, protection, society, maintenance and support of the deceased, who was her only support,'' and asks judgment for $50,000 therefor.

The defendant answered with a general denial and special plea as follows:

''And for further defense defendant avers that under and by virtue of the laws of California, as de-

clared in Nagle v. Railroad 88 Cal. 86, it is held that 'contributory negligence is attributable to a passenger who, without any intimation from the train men that it is his stopping place, while the train is halting a moment upon the trestle, alights hurriedly in the dark, without carefully looking for a place to alight and sustains injury from falling into a canon beneath the trestle and this, notwithstanding other passengers believed that it was a regular station, and some of them were preparing to leave the train, and the plaintiff was told by one of the passengers to get out quick, as the train would only stop a moment,' and defendant avers that it was contributory negligence for the deceased to leave said car upon which he was riding and walk off in the dark not knowing anything about the surroundings and without any invitation from defendant or its employees to do so and defendant avers that whatever injuries, if any, deceased may have sustained at the time and place in question were occasioned by reason of his own careless and negligent acts in walking off said car in the dark which directly contributed to and brought about his alleged injuries.''

Issue was taken by reply. The cause came on for trial before the jury on said June 5, 1912, resulting in a verdict for plaintiff in the amount of $18,000 upon which judgment was entered and from which this appeal was taken. The evidence developed the following facts.

The deceased, with the usual contract for transportation in such cases, was accompanying as caretaker a car containing a shipment of mules or jacks and bulls, shipped at Chillicothe, Missouri, and destined to Sisson, California, on defendant's railroad. At Grand Island, Nebraska, on the morning of March 16th, he was joined by Sherman Bailey, with a stallion destined for McArthur, California, on the same road. The horse was put in the same car with Miller's stock, and proceeded in charge of the latter as care-

taker and Bailey as his assistant, both the men riding in the car with the stock. At Ogden, Utah, the car was transferred to the defendant's railroad, over which it proceeded to Roseville, California, where it was attached to defendant's freight train going north through Red Bluff. At Roseville the train took another car of stock destined to a point in Oregon over the same railroad, in charge of James Willson and Joseph Pressler, who rode in the caboose. This train consisted of sixty or seventy cars when it left Roseville, and seems to have had fifty odd when it arrived at Red Bluff, a city of about four thousand inhabitants and a division station for two lines of the defendant's railroad.

It was the duty of the deceased to care for the stock in his car, feeding and watering it, getting the animals up should they fall down, and doing everything necessary for their comfort and preservation from injury. The town, or inhabited portion of it, lies on the north side of Red Creek, over which the defendant's road enters it upon a steel bridge consisting of three spans aggregating two hundred and twenty feet in length, of the deck girder variety, that is to say, the track structure was above the girders which supported it, and consisted of ties on which rails were laid. These extended only part way across the structure. There was no planking or railing of any kind to prevent a person from falling through it to the creek bed about fifty feet below. The yard limits of Red Bluff included this bridge, north of which its trackage lay. The points of the first switch were about six hundred feet north of the north end of the bridge and led out into three side tracks, each about a mile long, west of the main track. There were also two other side tracks east of the main track. The train upon which the deceased was riding came in from the south a little after seven o'clock over the bridge, took the switch into the first siding west of the main track, and passed on until it was clear of the switch leading to the side tracks

further west. Its motive power was insufficient for the remainder of the trip and it was made up with a helper. For this purpose the steel-frame cars were to be left in front of the extra locomotive which was to be placed in the train at that point, while the weaker wooden cars were to be placed behind it. The car in which the deceased was riding with his stock was the last freight car in the train, and next to the caboose in the rear. It was an Arms Palace stock car, with side doors about four feet wide.

When the train had been placed upon the side track the deceased and Mr. Bailey left the car, and went to the depot about a half mile north of the bridge, and from there found an eating house where they took supper. On returning to their car they found it about where they had left it, north of the switch. One of the mules was down; the other one having pushed the partition between them against him. They got him up, put the partition in its place, and looked for something to fasten it to the floor. Just as deceased was leaving the car on that errand, a trainman came past and suggested that if he would go into the caboose he could get what he wanted. The time was short until the train was due to move, and Mr. Miller and the trainman went up the steps to the front door of the caboose and found it locked. They then went to the rear door which was unlocked, and Mr. Miller went in, where he found Mr. Phillpot, the brakeman who was getting the caboose ready for the trip. To do this it was necessary that the markers or rear lights of the train should be put out, that all the lamps and lanterns should be lighted, and that the indicators, which were the figures representing the numbers of the train and caboose, should be put up in the rear of the cupola. Mr. Miller came in the car and explained that his stock had broken a partition and he wanted a block that he could nail down to the floor to hold it so that the animals could not crowd it over. About this time Mr. Phillpot became

aware that the switch engine had coupled to the car and that it was moving; and when it had stopped he came down out of the cupola and got from the oil cupboard what Mr. Miller wanted and gave it to him, and the latter went out the rear door at which he had come in. All this did not take more than three or four minutes, and Mr. Phillpot did not know that the car had been moved onto the bridge. When Mr. Miller went out, the switch engine had been uncoupled and moved back from the car, so that Mr. Hook, a switchman who stood on the footboard, was about ten feet away from the caboose, while the engineer, who was in the cab on the east side of the engine, was the length of the boiler away. The steam was escaping from the boiler with the usual noise and the injector was working.

Mr. Bailey had become interested in the continued absence of Mr. Miller, and stood in the east door of the Arms car, looking toward the caboose, and waiting for him to appear. He says that the head light of the switch engine over the front end of the boiler, shining along the side of the caboose, had the appearance of a path, but he could not see the bridge. As he stood in the door he saw Mr. Miller leave the bottom step of the caboose. Just then he heard the first warning from the engine, and started to get down, when some one called to him that they were on a trestle. He put his lantern down beneath the sill and saw the bridge for the first time. He heard no call from the engine until he saw Mr. Miller leaving the step.

A few seconds after Mr. Miller stepped out, Mr. Phillpot heard the switch engine give one blast of the whistle, which was unusual, and he walked to the back end of the caboose to see what was the matter. The moment he stepped out they began to holler at him. Some one said, ''Don't step off.'' He testified: ''Of course I stopped, and he said, 'Who fell off the caboose?' and I said, 'No one,' and he said, 'Yes, a

man just fell off the caboose.' I turned around and looked back in the caboose and saw that the stock man was gone." This was the first intimation Mr. Phillpot had that they were on the bridge. He said that although he had been in the same movement a dozen times he "never got· caught out there before." Nor did he know whether they had ever moved the caboose upon the trestle.

A few days before the accident the defendant had begun to prepare the bridge for planking and some of the floor timbers had already been distributed along the stringers. The floor was afterward finished, and a rail put up on the outside.

Mr. Phillpot testified as follows: "My duties as brakeman—we all know what it is—is to protect at all times the train, and if anything is going wrong to prevent any damage, anything that might. occur, and look after the train just the same as a man would look after his stock." He also testified as follows:

"Q. Of course, Mr. Phillpot, if you had known the caboose was standing on the trestle it would have been your duty to inform Mr. Miller of that fact, would it not? A. Yes, if I had known the caboose was on the trestle I would have told them; yes.

"Q. Why would you have informed them? A. Well, it is second nature of a man to protect another if he can.

"Q. Well, you would have informed him of that fact because you knew that the trestle did not have any banisters and it was dangerous to get off? A. Yes; and if I knew it had been stopping there, I most certainly would have told them.

"Q. That would have been a part of your duty to have told him there, under the circumstances, knowing what you did about the trestle? A. Yes, sir, that was part of my duty I suppose."

The plaintiff proved that the deceased was a bachelor forty-seven years old at the time of his

death, and at that time resided with his mother at the family home in Chillicothe, Missouri, where he had been the head of the family and supported her entirely from his own income and cared for her since the death of his father in September, 1908. None of her other children lived with her. He was domestic in his habits and spent all his evenings with her. He was a lawyer in active practice, earning from $2500 to $3000 per year. After his death the plaintiff went to live with a daughter, but the old home appealed to her, and after five or six months she came back to it and has lived there alone ever since.

Mrs. Miller testified, against the objection of defendant, that the Christmas after her husband's death she fell and broke her hip; that she was in bed eight or ten weeks and had been a cripple ever since, using crutches, and that deceased took care of her the most of the time. The admission of this evidence is assigned for error. In other respects her health was good considering her age. She also proved, against defendant's objection, that deceased had occupied the office of clerk and mayor of his city, prosecuting attorney and probate judge of his county, and chairman of the Republican central committee of his county and Congressional district. This is also assigned for error. Further reference will be made to the evidence as necessary.

After the evidence was all in the defendant asked a peremptory instruction for a verdict, which was refused and exception taken. The court at the request of plaintiff instructed the jury as follows:

"1. The court instructs the jury that, if they believe from the evidence that Mary E. Miller is the mother of Frank S. Miller, and that he was on the 23rd day of March, 1911, single and unmarried, had no children, and his father was dead and that, on or about the 23rd day of March, 1911, Frank S. Miller was, with the consent of defendant, on a freight train of de-

fendant, acting as a caretaker of live stock being transported on said train, and while the caboose was attached to the train standing in the switch yards of defendant in Red Bluff, California, in a safe place and on level ground, entered the caboose and remained there in the presence of the agent of defendant in charge of the operation thereof, and while so inside the caboose, it and a portion of the train was switched and moved in the railroad yards of defendant at Red Bluff, by defendant by its agents and servants, and was by them left standing on a high and unprotected trestle or bridge with no light thereon, and while it was dark and in the nighttime, and that Frank S. Miller was unaware that the caboose had been moved and left standing on said trestle or bridge after he got into the same, and that defendant, its agents and servants, knew, or, by the exercise of ordinary care, could have known that Frank S. Miller was in said caboose and was in charge of live stock on said train, and might reasonably leave the caboose to attend to and care for the live stock at any time, and that Frank S. Miller was unfamiliar and unacquainted with the surrounding conditions with reference to the location of said caboose on said trestle, and, on account of the darkness, did not discover or ascertain that the caboose was standing on said trestle or bridge, or that it was dangerous to alight therefrom, and that the agents and servants of defendant in charge of said caboose and train were present when said Frank S. Miller attempted to leave said caboose, and did not inform him that the caboose was standing on said trestle or bridge, and of the danger in attempting to alight therefrom, and he did not receive any warning or notice, and, under all the circumstances, you believe they were negligent in not so informing him, and that the said Frank S. Miller, while attempting to leave or alight from the caboose by means of the steps, made at the rear end of said

266Mo.3

caboose for the purpose of ingress and egress, to attend to his duties as a caretaker of said stock, stepped from the steps thereof, and that they extended over the ties and sides of said trestle or bridge, and that, by reason thereof, he fell a distance of about forty feet, striking the water, ground and rock under the trestle or bridge, from which he received injuries resulting in death in the course of a few hours, then you may find for the plaintiff, provided, however, you further find that the said Frank S. Miller at the time herein referred to, while leaving the caboose, was exercising ordinary care under all the circumstances for his own safety.''

''3. The court instructs the jury that, if their verdict is in favor of the plaintiff, Mary E. Miller, such damages may be given by them to plaintiff as, under all the circumstances of the case as disclosed by the evidence, may be just. And, in determining the amount of such damages, if any, you may take into consideration the pecuniary loss, if any, suffered by this plaintiff in the death of Frank S. Miller, by being deprived of his support, if any, and the pecuniary loss, if any, sustained by her in the loss of his society, comfort and protection, if any, in all not to exceed the sum sued for, $50,000.''

Error is assigned to the giving of both these instructions. The defendant asked and the court gave a number of instructions telling the jury that there was no evidence showing that defendant's employees invited Mr. Miller, either expressly or by implication, to leave the caboose at the time and place he attempted to do so, or led him to believe that the caboose was in a safe place for him to alight; and that if he was warned that the caboose had been moved, and not to leave the same, prior to stepping from the last step of the caboose and in time to save himself from falling, their verdict must be for the defendant. It also asked and the court gave the following instruction:

"8. The court instructs the jury that it was the law of California at the time of the alleged injury to the deceased, Frank S. Miller, that a person traveling on a freight train as a passenger was guilty of contributory negligence, who, without any intimation from the trainmen in charge of the train upon which such passenger was riding, that such passenger was at a depot where passengers usually alight, while the train was halted a short time upon a trestle, to hurriedly leave said train, in the dark, not knowing where he was stepping and without carefully looking where he was stepping.

"You are therefore instructed that if you find and believe from the evidence in this case that at said time and place complained of, the deceased, Frank Miller, was riding on a freight train of defendant, and while at said Red Bluff, California, the said Frank Miller got upon the caboose of defendant's train to procure a board to fix up a partition in the car in which he was riding with some stock, and that while in said caboose the same was switched onto the main line of defendant's road over the trestle described in evidence; and that said Frank Miller knew, or by the exercise of reasonable care would have known, that said caboose was being moved after he went upon the same, and while said caboose was standing upon said trestle, said Miller left same, in the darkness, without any intimation from the train crew that said train was at a place provided for passengers leaving said car, or that said place was a safe place to alight from said caboose and hurriedly attempted to alight from said car in the dark and not knowing where he was stepping and without using due care to ascertain his surroundings, and fell and was injured thereby, then you are instructed plaintiff cannot recover in this action, and you will return a verdict for defendant."

The court refused an instruction telling the jury that defendant had the right to make any defense

he had by virtue of the laws of California; that said right was a property right protected by the Fourteenth Amendment of the Constitution, and that under the law announced in the case of Nagle v. Railroad, 88 Cal. 86, plaintiff was guilty of contributory negligence in walking off the caboose without knowing where he was going and without looking where he was stepping, and that they should therefore return a verdict for the defendant. It also refused to instruct as follows:

"13. The court instructs the jury that if you should find the issues for plaintiff under the instructions herein you cannot award her any damages for mental pain or suffering by reason of the death of the deceased, Frank S. Miller, but you will only allow that amount as she would have received from said Frank S. Miller, deceased, for the time of her expectancy, and you are further instructed that the years of expectancy do not exceed six years."

I. This is an action under a California statute, brought against defendant by the mother of Frank S. Miller, to recover damages for the death of Mr. Miller, which is alleged to have been caused by the wrongful act of the defendant in that State. It is admitted upon the record that the plaintiff, as his sole heir under the laws of California, is the proper party to sue, and is the person to whom any damage recovered will accrue, so that that question need not be further considered. The deceased was killed by stepping off the steps of the caboose attached to a freight train upon which he was a passenger through an undecked bridge approximately fifty feet high, upon which the car was standing at the time. The suit is founded upon the theory, which is well pleaded in the petition, that under all the circumstances the defendant was guilty of negligence in placing the car, in which Mr. Miller was riding at the time, upon the bridge without warning to him. If this is

true, the negligence was the proximate cause of his death, unless he was negligent in getting off the car as he did, so that his own negligence contributed directly to his injury. Accepting the burden imposed in this jurisdiction, by the laws of which all matters of practice are governed and must be determined, the defendant pleads in its answer that under the law of California as construed by the highest court of that State in Nagle v. California Southern Railroad Company, 88 Cal. 86, it was negligence for the defendant to get off the car at that particular time and place. This question of negligence of the respective parties presents the principal issue for our consideration. Examining the authority pleaded, we find that the question considered by the California court related solely to the duty of the passenger in determining whether or not he had arrived at the station at which he was to alight. This question is so different from the one raised by the facts in this case that it will not be necessary to make further reference to the authority. Upon examination of all the California cases cited to us in argument we do not find the interpretation of the law applicable to these facts as held by the courts of California to be different from that applicable in this and most other American States.

II. Referring first to the question of defendant's negligence charged in the petition, we cannot do better than to point to our own definition of "due care" and "negligence" in Dean v. Railroad, 199 Mo. 386, 408, where we said, in substance, that due care is a

**Alighting from Caboose: Contributory Negligence.**
care adjusting itself to the circumstances of the case, and that negligence is simply the absence of such care. The circumstances of this case do not involve the operation of an ordinary train carrying passengers whom it receives and discharges at the stations along its line. There is nothing in this evidence to indicate that this train,

ever did or was permitted to carry passengers in that sense; or that it ever stopped at stations to let persons on or off. We simply know from the evidence that it was a freight train carrying stock, upon which the owners of the animals or their representatives or servants rode upon a contract which had been exhibited as transportation in this case, and that while it was the duty of the defendant to carry the animals, it was both the privilege and duty of the caretaker accompanying them to care for them at all times, to make them comfortable, and to preserve them from injury; and that wherever the train should stop in the performance of the regular work incident to its operation, he was expected to descend from the car if necessary and perform these duties. In this case the train was in a terminal yard of defendant where it was to remain more than an hour, which would presumably be available for this work. It arrived after dark. The deceased was riding in a stock car. The bridge construction did not extend above the track and there is no evidence whatever, either by statement of witness or necessary inference, that he knew of its existence. It might be said that the noise of this train in passing over the bridge would indicate its existence, even to the inexperienced; but at the time of the accident the same cars were backed onto and nearly across it without indicating to Mr. Phillpot, a brakeman of several years' experience, that the car in which he was riding was not on solid ground. About five minutes before the accident, the time being indicated by the statement of Mr. Phillpot that he was from three to four minutes in the cupola of the car, the deceased had been advised by one of the trainmen to pass from his own car to the adjoining caboose from which he stepped to his death. Under all the circumstances of this case, the place for the deceased to alight from the car was anywhere within the limits of the yard, unless some local element of unsuitability should appear.

The circumstances under which Mr. Miller did alight with the unfortunate result out of which this cause has grown, are plainly and clearly in evidence. The train was getting ready to start; the extra engine had been put in its place in the middle, and the switch engine that had given it the fifteen or twenty rear cars of which this caboose was the last, had released it, so that it was ready to go on the road. The lights which were to protect it from the rear had been placed in position by Mr. Phillpot. Mr. Miller was in a hurry to get his partition nailed down before it should start. He waited patiently in the caboose three or four minutes while Mr. Phillpot was putting up his indicators and lighting his lamps and lanterns so that he could hand him his block. As soon as he had done this Mr. Miller took it, and turned and opened the same door at which he came in less than five minutes before, went out on the platform and confronted the big acetylene head light on the front of the boiler within ten feet of his face. Forty feet further to the front Mr. Bailey stood leaning out of the door watching for him. While he also was over the bridge he could not see it, but the light made it look like a path along the side of the car. Mr. Miller in his hurry started for the west steps, but correcting himself he turned to the east side and started down. Mr. Bailey saw him step off and disappear beneath the cone of rays from the head light. Mr. Hook stood under the head light within ten feet of him and as he stepped off he was horrified and shouted to him not to do it. We will presume that during all this time Mr. Miller was not attempting to commit suicide, but had proper regard for his own safety, using reasonable care under the circumstances as they appeared to him, in all his movements. Just as he left the caboose Mr. Bailey heard a shout from the engine, and started to get out himself, when the engineer or Mr. Hook called to him to look out, that they were on the trestle. He got back in the car, got his

lantern and put it under the sill of the car, and saw the trestle for the first time.

Mr. Phillpot, the brakeman in the caboose, was equally ignorant. He heard an unusual whistle from the engine and started for the rear platform of the caboose. When he arrived there they called to him from the engine not to step off, and told him that a man had just fallen off. He turned away and looked in the car and saw that Mr. Miller was gone and the engine men had gone running down the bank with the lantern to pick him up. The information he received from the engine was his first knowledge that they were on the bridge. He testified that had he known, it would have been his duty to notify Mr. Miller and the other persons in the car of the fact, and that he certainly would have done it.

Although two men who were in the caboose at the time testified that the fact that they were on the bridge had been spoken of in the caboose in Mr. Miller's presence, neither of them said that he had given any indication that he heard it, and their testimony in other respects was so at variance with physical facts that it is not calculated to suggest much doubt as to the accuracy of the statement made by the brakeman. We are driven to the conclusion that it had not occurred to either Mr. Miller, Mr. Phillpot or Mr. Bailey that the caboose did not still stand in the yard where it was perfectly easy and safe to get off; and that in the darkness, as modified by the glare of the headlight it was impossible for either to see the bridge either from the platform or steps of the caboose or from the door of the stock car where Mr. Bailey was standing watching for his companion. It is certain that the appearances were such that Mr. Miller stepped down to his death without hesitation, and that Mr. Bailey and Mr. Phillpot would have unhesitatingly done the same thing had they not been warned by Mr. Hook and the engineer, the first named of whom stood

under the headlight with his feet within a few inches of the ties and the latter leaning from his cab behind the headlight. Whatever we may think about the optical conditions, these men were all there, and they testified as to how it looked to them, as well as to what was said and when it was said. Mr. Miller testified to the same effect with his life and the jury found from this testimony that he acted as a man of ordinary prudence would have acted under the same circumstances in leaving the car. This question was submitted in language selected with the most delicate skill by the defendant, and it is not our province to question their judgment.

III. . This leads us to the question whether under the facts stated in the last paragraph the defendant exercised that high degree of care that the law exacts from the carrier for the protection of the lives of its **Due Care:** passengers. It seems to us that the ques-
**Open Bridge.** tion answers itself in the negative. For its own profit the defendant requires shippers of stock and their caretakers, strangers to its road and property, to care for their shipments in transit, and to get on and off the cars whenever and wherever necessary for that purpose without reference to the stations used for receiving and discharging other passengers. This service may be performed in the nighttime as well as by day, and the inducement is not so much in the nature of an invitation as of a command. It is a duty expressed or implied by the contract under which they are transported, and requires at its hands a care for their safety as broad as the peculiar conditions attending it. To say that a danger consisting of an open bridge over a rocky canyon forming a part of the yard in which these services are performed, unsupplemented with a warning of the danger, is consistent with such care is, to put it mildly, illogical. Mr. Phillpot, whose experience qualified him to testify on

that subject, is to be believed when he said that had he known where the car was it would have been his duty to notify Mr. Miller, and the law cordially endorses the logic of his conclusion. If this were true it was the duty of those who knew, and who managed the engine by which the danger was created, to tell him, so that he could perform his duty.

The negligence of defendant with reference to this situation is fully and properly pleaded in the petition and we cannot interfere with the finding of the jury in that respect.

IV.   This leaves us the question relating to damages.  The instruction authorizes the jury in the words of the statute, should they find for the plaintiff, to give her such damages "as, under the circumstances of the case as disclosed by the evidence, may be just." They were further directed that in determining the amount of such damages they might take into consideration the pecuniary loss, if any, suffered by plaintiff in the death of her son by being deprived of his support, if any, and the pecuniary loss, if any, sustained by the loss of his society, comfort and protection, if any.   The defendant urges that the instruction is erroneous in including the two elements of damages last mentioned.

While it may be that the Supreme Court of California has not always been perfectly plain in its language as to the elements of damage contemplated by the law under which this suit is brought, its general course has resulted in the establishment of rules which leave but little difficulty in the consideration of this instruction.   The statute gives the right of action to the *heirs* of the deceased, and provides that in every such action "such damages may be given as under the circumstances of the case may be just." In connection with the wide latitude given the jury in this respect, which in terms makes their sense of justice the only limita-

tion upon their judgment as to the amount of damages, we note the fact that the action is to the "heirs." It was no doubt intended that an action should lie in favor of the heir in all cases, and this necessarily implies that in the assessment of damages the right or expectation of the plaintiff as *heir* should be an element; but the appeal to the sense of justice of the jury indicates that something more than this was contemplated and that to the extent of the class included by the Legislature it was intended to place those benefited by the life of the deceased as nearly in the condition they would be had his life continued as could be done by *pecuniary* compensation for their loss. This view of the question received early consideration from the Supreme Court of California in Beeson v. Green Mountain Gold Mining Company, 57 Cal. 20, in which an instruction was considered and upheld which is substantially like the one given in this case. It told the jury, as does this one, that "such damages may be given as under all the circumstances of the case may be just," and added that, in determining the amount, they may take into consideration the pecuniary loss, if any, suffered by the plaintiff in the death of the deceased by being deprived of his support; also the relations existing between plaintiff and deceased at the time of his death, and the injury, if any, sustained by her in the loss of his society. The case received a most thorough consideration by that court, which said in substance that while it was true that in one sense the value of social relations and of society cannot be measured by any pecuniary standard; in another sense, it may not only be possible, but eminently fitting, that a loss from severing social relations, or from the deprivation of society, might be measured, or at least considered, from a pecuniary standpoint. This idea has its counterpart in cases of purely physical injuries, for who would say that simple disfigurement should not be the subject of pecuniary compensation because

it might not affect the earning capacity of the sufferer? The California court went on to say that in its opinion the social and domestic relations of the parties, their kindly demeanor toward each other, the society, were parts of "all the circumstances of the case" for the jury to take into consideration in estimating what damages would be just from a pecuniary point of view.

In Cook v. Railroad, 60 Cal. l. c. 609, the same question arose. The plaintiff's wife was allowed to testify that it was the usual custom of deceased to be at home after business hours; that they had lived a happy married life, and that for eight years prior to his death she had been an invalid during which he had been very kind and attentive, and that she was dependent upon him. The daughter was allowed to testify that he was a kind father; that the social and domestic relations as to the family on his part were happy; and that he was kind and loving to the plaintiff. The court said: "The first and second points above stated are fully covered by section 377, C. C. P. — 'Such damages may be given as under all the circumstances of the case may be just'—and by the decision of this court in Beeson v. G. & S. Co., 57 Cal. 20. We are asked to review that case, and change or modify the views therein expressed. We decline to accede to that request; on the contrary, we here follow them." In Morgan v. Southern Pacific Company, 95 Cal. 510, 517, the court reversed a judgment for $20,000 for the death of a two-year old child on the ground that the court charged the jury that it was not limited by the actual pecuniary injury sustained by the mother by reason of the death of the child, at the same time quoting with approval from the Beeson case as follows: "It is true that in one sense the value of social relations and of society cannot be measured by any pecuniary standard; . . . but in another sense, it might be not only possible, but eminently fitting, that a loss from severing social relations, or from deprivation of society, might be meas-

ured, or at least considered, from a pecuniary stand-point.''

In Pepper v. Southern Pacific Co., 105 Cal. 389, a suit by a father for damages for the death of a son twenty-five years old residing apart from the plain-tiff, the court disapproved an instruction which told the jury that in assessing the damages they may *in addition to the pecuniary loss and injury sustained* take into consideration the loss, if any, sustained by the plaintiff in being deprived of the comfort, society and protection of the deceased by reason of his death. In doing so it said: ''It may well be doubted whether the facts of this case justified any, even the most guarded, instruction in relation to compensation for the deprivation of the comfort, society and protection of the deceased.'' In Lange v. Schoettler, 115 Cal. 388, the same court, in holding that the ordinary rule relat-ing to recovery of exemplary damages did not apply to cases prosecuted under this statute, said: ''It is true, in the case of a mother or a wife the jury have been allowed to consider the fact that they were de-prived of the comfort, society, and protection of a son or husband, but it has been always held that this was in strict accordance with the rule that only the pecun-iary value of the life to the relatives could be recovered. The probable comfort, society and protection of the deceased had some pecuniary value.''

In Green v. Southern Pacific Co., 122 Cal. 563, 567, the court, following Harrison v. Railway, 116 Cal. 156, 169, said: '' 'While the jury have the right in such a case to consider the loss suffered by the widow in being deprived of the comfort, society and protection of her husband, they can regard these things only for the purpose of fixing the pecuniary value of his life. The form of the instruction here was calculated to lead the jury into the error of supposing that they could on this account add something more than pecuniary loss.' '' In Skelton v. Lumber Co., 140 Cal. 507, 512,

the court, in sustaining a judgment for $18,000 in favor of the widow and minor children for the death of the husband and father, a workman in defendant's mill, said: "The proof of the value of the deceased as a wage-earner might not alone justify the amount awarded; but there were other elements of damage to be considered by the jury, which they alone were competent to consider." In Sneed v. Gas & Electric Co., 149 Cal. 704, 710, the court, while holding it to be definitely settled that under this statute the damages to be recovered are always limited to the pecuniary loss suffered by the heirs, said: "We think it may be further said that this pecuniary loss may be either a loss arising from the deprivation of something to which such heirs would have been legally entitled if the person had lived, or a loss arising from a deprivation of benefits which, from all the circumstances of the particular case, it would be reasonably expected such heirs would have received from the deceased had his life not been taken, although the obligation resting on him to bestow such benefits on them may have been a moral obligation only." In Peters v. Southern Pacific Co., 160 Cal. 48, 69, the court citing numerous California cases said: "It is too well settled in this State to be now open to question that in actions of this character the plaintiff is entitled to recover for all pecuniary loss sustained, and as elements in determining that pecuniary loss the jury are to take into consideration the loss which the wife and children have sustained through being deprived of the comfort, society, support and protection of the deceased by the wrongful act of the defendant." The last case to which our attention has been directed is Crabbe v. Gold Mining Co., 168 Cal. 500, decided in 1914. It was a suit by the administrator of the deceased, a miner killed in working the mines of defendant, brought under this statute. There was a judgment for $20,000. The judgment was affirmed, the court saying: "The jury were entitled to take into con-

sideration the loss of society, comfort and care suffered by the surviving children on account of the death of their father. [Dyas v. Southern Pacific Co., 140 Cal. l. c. 308.] It may not be said that under the facts and circumstances of this case the award of the jury was excessive.''

The cases we have cited fully cover the doctrine of the highest judicial court of the State of California with reference to the assessment of damages under the statute upon which this suit is brought. Our references have necessarily been incomplete, but they cover the entire period of the history of this act in its present form, down to the present time, and firmly establish the rule to be that, while this statute authorizes in terms the jury to give such damages as under all the circumstances may be just, they are confined to pecuniary damages alone; that these, in turn, are not confined to compensation for the destruction of legal rights, but include those moral rights lying in reasonable anticipation as well as in present enjoyment, in favor of the class made by the act its beneficiaries as heirs to the probable prospective accumulations of the deceased from his personal exertion. Damages for the destruction of a home of which the beneficiary has the moral right to expect the continuance, including the benefits reasonably expected from the kindly relations of the parties and the peculiar disposition of the deceased toward his family, considered in connection with their physical condition and needs; and the loss to the beneficiary of the society, comfort and care of deceased, is also included to the extent of their pecuniary value. They are founded upon the theory that the wrongdoer ought not to be permitted to destroy the home or to take away the support, society, comfort and care which one enjoys, and of which he has a moral right to expect the continuance, and escape liability to the extent of purely pecuniary compensation for the wrong, on the ground that these things, however important they

may be to the life and future of the sufferer, are too intangible to be cognized by the law.

Although the instructions complained of are perfectly consistent with these views, and fully authorized by the evidence, we are constrained by the amount of the verdict to believe that the jury, in its consideration of these questions placed an excessive value on some of these legitimate elements of damage. We will therefore in accordance with our settled practice in cases calling for such disposition, affirm the judgment upon condition that the plaintiff will, within ten days from this date, remit from its amount the sum of eight thousand dollars as of the date of its entry; otherwise the judgment will stand reversed, and the cause remanded for a new trial. *Railey, C.,* concurs.

PER CURIAM.—The foregoing opinion of BROWN, C., is adopted as the opinion of the court. All the judges concur.